UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| ASCENTIUM CAPITAL LLC, | |
|---|---|
| Plaintiff, | |
| v. | Case No. 2:20-cv-04215-NKL |
| TED LITTEL, TIMOTHY LITTELL, and WHITE KNIGHT LIMOUSINE, INC., | |
| Defendants. | |

### ORDER

Plaintiff Ascentium Capital moves for summary judgment against all Defendants.[1] Doc. 76. Ascentium claims that a reasonable jury could only conclude that Defendants breached the five contracts at issue, Ascentium is entitled to a deficiency judgment, and Defendants' affirmative defenses fail. For the reasons stated below, Ascentium's motion is granted.

### I.  FACTS[2]

Between June of 2017, and December of 2019, White Knight applied, and was approved for, five different loans from Ascentium Capital. The proceeds of three of these loans were used to purchase or lease motorbuses.[3] The fourth loan was used to finance the purchase of a snowplow,[4] and the fifth loan was used to increase White Knight's working capital.[5] All of the

---

[1] Plaintiff sought summary judgment against Defendant Timothy Littell. However, since the Court is striking Tim Littell's pleadings, and entering a default judgment against him, Doc. 89, the summary judgment motion as to Tim Littell is moot and the Court will only analyze this motion as it pertains to White Knight Limousine, Inc. and Ted Littell.
[2] The below facts are undisputed unless otherwise noted.
[3] Those loans are designated as EFA 662, Lease 613, and EFA 184, in the briefing.
[4] This loan is designated as EFA 247.
[5] This loan is designated as BLSA 707.

loan agreements list Defendants Ted Littell and Timothy Littell as guarantors of the loans.

All five loan agreements state that upon default, Ascentium is entitled to accelerate all required payments, repossess the collateral for the loans, recover the attorney's fees and costs spent enforcing their rights, plus 1.5% monthly interest on all past due amounts. The agreements state that California law applies to any dispute related to the agreements.

White Knight made their regular payments to Ascentium until April of 2020, when White Knight stopped making payments. As a result, on May 24, 2020, Ascentium repossessed the three motorcoaches. On May 29, 2020, Ascentium sent a notice of the repossession to White Knight and Ted Littell that stated Ascentium planned to resell the collateral at a private sale. Defendants sold all three pieces of collateral via private sales between July 27, 2020, and September 24, 2020. The busses sold for between $12,500 and $13,000. These amounts were credited against White Knight's outstanding balances. On September 24, 2020, Ascentium sent White Knight a notice of default and acceleration which provided a calculation of what White Knight owed as of that date.

## II.  LEGAL STANDARD

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists[,] and the movant is entitled to judgment as a matter of law." *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 669 (8th Cir. 2019) (citation omitted); Fed. R. Civ. P. 56(a). "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995). The moving party bears the burden of establishing a lack of any genuine issues of material fact. *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010) (citation omitted). "If the

movant bears the burden of proof on a claim at trial . . . It must lay out the elements of its claim, citing the facts it believes satisfies those elements, and demonstrating why the record . . . rule[s] out the prospect of the nonmovant prevailing." 10A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ § 2727.1 Grounds for Summary Judgment—Burden on the Moving Party. (4th ed. 2021) (collecting sources); *see also Leone v. Owsley,* 810 F.3d 1149, 1153 (10th Cir. 2015) ("[W]here the moving party has the burden [of proof]—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.") (collecting sources)).

## III. DISCUSSION

### A. Issues in Dispute

Ascentium's claim is for breach of contract. Under California law "[a] cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *Miles v. Deutsche Bank Nat'l Tr. Co.*, 186 Cal. Rptr. 3d 625, 631 (Cal. Ct. App. 2015) (quoting *CDF Firefighters v. Maldonado*, 70 Cal.Rptr.3d 667 (Cal. Ct. App. 2008)).

Defendants have conceded each of these elements.[6] Therefore, Ascentium has established as a matter of law that Defendants have breached each of the loan agreements.

However, Defendants contend that the loan agreements are not enforceable because the purpose of the agreements was frustrated by COVID-19 and because their performance was

---

[6] While Defendants did state in their response brief that they were challenging the electronic signatures on three of the loan agreements, EFA 247, EFA 184, and BLSA 707, they conceded at oral argument that these agreements were in fact signed by Defendants through the DocuSign system.

3

Case 2:20-cv-04215-NKL    Document 102    Filed 02/01/22    Page 3 of 13

impossible or impractical because of COVID-19. Defendants also contend that Ascentium is not entitled to a deficiency judgment and that Ascentium failed to mitigate its damages.

## B. Whether Ascentium is Entitled to a Deficiency Judgment

### 1. Whether Ascentium Sold the Collateral in a Commercially Reasonable Manner

Under California's Commercial Code, a creditor is entitled to a deficiency judgment if "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, [is] commercially reasonable."[7] Cal. Com. Code § 9610.

The burden of proof is on Ascentium to establish commercial reasonableness, Cal. Com. Code § 9626(a)(2), and that inquiry is "intensely factual." *Ford & Vlahos v. ITT Commercial Fin. Corp.*, 8 Cal. 4th 1220, 1235 (Cal. 1994). Commercial reasonableness can be established if the disposition of the collateral meets any of the following conditions:

> (1) It is made in the usual manner on any recognized market.
> (2) It is made at the price current in any recognized market at the time of the disposition.
> (3) It is made otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition. *See* Cal. Com. Code § 9627(b).

Ascentium cannot rely on Cal. Com. Code § 9627(b)(1) or (b)(2) because California law makes clear that a "recognized market" is "a market[] in which there are standardized price quotations for property that is essentially fungible, such as stock exchanges." Cal. Com. Code § 9627 cmt. 4. Ascentium has put forth no evidence that the private sale of the motorbuses met that definition of a "recognized market". Thus, the Court turns to subsection (3) to consider whether

---

[7] Ascentium must also show that its notice of the sale was commercially reasonable. Cal. Com. Code § 9611. However, Defendants only contest that the notice provided to Tim Littell was insufficient. And as stated above, all arguments regarding Tim Littell are moot because the Court is going to strike his pleadings and enter a default judgment against him.

the private sales were made "otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition."

Ascentium primarily relies on the deposition testimony of its two expert witnesses to support its argument that it sold the motorcoaches in a commercially reasonable manner. Ascentium's first expert witness is John O'Brien. O'Brien is a "[s]pecial assets manager" at Ascentium. Ex. 97 (O'Brien Deposition Transcript), at 8. In that role he was responsible for repossessions, remarketing, and asset disposition. Ex. 97, at 11. In this role he has experience reselling motorcoaches. Ex. 97, at 12 (stating 20 to 25 percent of his past work involved motorcoaches). Ascentium's second expert is Mike Pouncey who was the Vice President of Sales at Ascentium since June of 2019. Ex. 98 (Mike Pouncey Deposition), at 6-7. His primary role is to work with dealerships to finance units that are being bought and sold. Ex. 98, at 7. He testified that he worked primarily in the "passenger transportation space" which includes "motor coaches," and that he also helps sell repossessed vehicles that "fit the industry I am responsible for." Ex. 98, at 7-8. In this case, he worked with John O'Brien "to try to remarket the units in the best possible way to get the most return possible." Ex. 98, at 15-16.

O'Brien testified that in every repossession Ascentium, "come[s] up with a game plan to sell the asset. And then . . . we go through that process and try and get the most money possible." Ex. 97, at 17; *see also id.* at 19 ("Well, it -- basically looking at the asset on a case-by-case basis, and determining how we can sell something to maximize its resale value.").

When O'Brien was asked "what game plan was created," he said they decided against using an auction "due to the market conditions and the conditions that the buses were in, [and] decided to post them on [Facebook] in the motor coach group that Mike [Pouncey] was a member of to get exposure directly to that industry." Ex. 97, at 25. He described the Facebook group as one "with

5

members who are all part of the motor coach industry." Ex. 97, at 25. He stated that Mike Pouncey also, "made direct contact with potential buyers due to his connections in the industry," and that posting online and reaching out to direct contacts were part of the avenues Ascentium generally used when reselling collateral. Ex. 97, at 19, 25. O'Brien confirmed that "Ascentium's resale team during mid-to-late 2020 resorted to various non-customary channels to resell equipment for the best available price at the time." Ex. 97, at 11. He specifically pointed to the impact of the pandemic. Ex. 97, 34-36.

O'Brien opined that under these conditions it would be unreasonable to expect a higher sales price than what was received because the market had collapsed, and that based on his experience "the price received by Ascentium was as good as any other seller of similar used equipment would have received." Ex. 97, at 35-38. O'Brien also testified that some of the busses needed to be repaired which also affected the price, Ex. 97, at 30-34, 36, and some sales fell through.

Mike Pouncey testified that Ascentium listed the busses on the motorcoach operators Facebook page, Ex. 98, at 20, because that page, "consists of a lot of motor coach operators across the country . . . [who] share stories about buses. People post buses for sale on there. That's primarily what it does." Ex. 98, at 18. He confirmed that the group had 5,900 members. Ex. 98, at 18. He included pictures of the busses taken from a remarketing company in the advertisment. Ex. 98, at 23-24. He stated the "purpose of the Facebook post is to get someone interested and then make contact, and then you can provide them with the link that was on the website where they

6

Case 2:20-cv-04215-NKL   Document 102   Filed 02/01/22   Page 6 of 13

could go see all the detailed photos and the inspection reports." Ex. 98, at 33. The lead for the sale of the 2004 motorbus came from Facebook. Ex. 98, at 21.[8]

Pouncey also directly spoke to a number of dealers "telling them that [Ascentium had] some units available, if they have any customers that are looking for similar units." Ex. 98, at 20. In addition, he called many "customers and companies that [he] thought may have an interest in those units based on what [he] knew about what type of buses they operated in their fleet and what type of buses that those were." Ex. 98, at 17. Pouncey testified that the buyer of the 2007 motorbus and the 2008 motorbus was one of these previous contacts. Ex. 98, at 29-30.

The final industry channel that was used to sell the busses was a remarketing website that was maintained by a third party. Ex. 98, at 19. Pouncey explained that the information on this website was forwarded to anyone who reached out about the busses or that he reached out to. Ex. 98, at 27-28, 33, 65-66.

Pouncey opined that that "social media, direct contact relationship and websites" were the three appropriate industry channels that it made sense to use when reselling the motorbuses. Ex. 98, at 47-48. He has used these avenues, "in his previous years selling busses. And I've sold in my career more buses than I can count." Ex. 98, at 48.

Pouncey testified that the pricing was made based on the "age of the bus, the condition of the bus mechanically and cosmetically." Ex. 98, at 25, 32, 39, 43-47. He also said the COVID-19 pandemic and the need for repairs depressed the prices Ascentium received for the motorbuses. Ex. 98, at 26, 34-37, 40-41. He confirmed O'Brien's testimony that Ascentium tried marketing

---

[8] Defendants contest Mike Pouncey's testimony that people primarily sold busses on this Facebook page because the description states the group is "for Motorcoach Operators to talk, share ideas, thoughts, and visions about being a true Operator." However, the fact that this group was a place where motorbus operators shared ideas does not mean it was not also used to sell busses, and Defendants have presented no contrary evidence.

the 2007 and 2008 motorbuses for two months before eventually selling them. Ex 98, at 51-52. He stated that the value of the motorcoaches would "depreciate every day." Ex. 98, at 52.

Pouncey summarized that Ascentium tries to get as much for a debtor's collateral as it can, and that in this case, Ascentium received the highest possible price based on what he was seeing in the market at that time. Ex. 98, at 50-52.

Defendants argue that the foregoing record is insufficient to grant Ascentium's motion for summary judgment because Ascentium has failed to disclose the number of calls it made, or the number of users in the Facebook group who were interested in buying motorcoaches. Defendants also argue that Ascentium reached out to too few customers, only posted in one Facebook group, sold the collateral when the prices were depressed, and stated in the advertisement that the busses "Must go". However, Defendants have produced no evidence that a creditor must make a minimum number of contacts, purchase a minimum number of ads, or refrain from using certain language before their efforts are deemed commercially reasonable.

Ascentium's experts' testimony is "unequivocal, positive, internally consistent, and in full accord with the documentary exhibits." *Nationwide Prop. & Cas. Ins. Co v. Faircloth*, 845 F.3d 375, 382 (8th Cir. 2016). While the witnesses are Ascentium employees, defendants have not challenged the veracity of their testimony but instead argue the evidence is insufficient. As a result, Defendants' critiques do not create an issue of fact that is worthy of trial. *Id.*

Indeed, the only evidence identified by the Defendants to dispute whether Ascentium's sale of the collateral was commercially reasonable is that the busses were sold for a fraction of their original purchase price.[9] However, these price discrepancies are insufficient to defeat Ascentium's

---

[9] The 2004 Prevost motorcoach was originally bought for $160,830.00 in 2017, and it was sold for $13,000.00. The 2007 Prevost motorcoach was bought for $139,850.00 in 2017, Ascentium

8

Case 2:20-cv-04215-NKL    Document 102    Filed 02/01/22    Page 8 of 13

claim for summary judgment. While a low price invites extra judicial scrutiny of Defendants' sale practices, it is insufficient to show the sale of the collateral was not commercially reasonable. Cal. Com. Code. § 9627, cmt. 2.[10] Additionally, Defendants have no evidence that contradicts Ascentium's experts' testimony that this was the best price they could get at the time due to the depressed nature of the market and the repairs that were needed on Ascentium's busses. *See* Ex. 97, at 30-31, 34-36; Ex. 98, at 26, 34-37, 40-41. On this record a reasonable jury could only find that Ascentium's practices were commercially reasonable.

The cases cited by Defendants to the contrary are distinguishable. In *S. Devs. & Earthmoving, Inc. v. Caterpillar Fin. Servs. Corp.*, 56 So. 3d 56, 59-61 (Fla. Dist. Ct. App. 2011), the court overturned summary judgment for a creditor because the creditor "submitted absolutely no evidence" that the sale was commercially reasonable, and defendant submitted an affidavit that alleged the use of a public auction was not commercially reasonable. In *Ford*, 885 P.2d at 879, 881-84, 886, the Supreme Court of California held that a creditor does not establish that a public auction was commercially reasonable merely because the creditor complied with the California Commercial Code's notice requirement, and the creditor was not entitled to summary judgment when their only outreach before the public auction was placing a single ad in a newspaper of general circulation. Neither case has bearing here because Ascentium has provided evidence, that

---

resold it for $12,500.00. And the 2008 Prevost motorcoach was bought for $119,500.00 in 2019, and Ascentium resold it for $12,500.00.

[10]Courts across the country have granted creditors summary judgment when a debtor's only evidence that the sale was unreasonable is the price at which it was sold. *E.g.*, *Provident Bank v. Bonnici*, No. A-1586-11T1, 2012 WL 2283458, at *3 (N.J. Super. Ct. App. Div. June 19, 2012) (stating that because debtor's evidence was "silent on plaintiff's methodology and only addresses the boat's value, the report failed to create a genuine dispute of fact that would defeat summary judgment"); *BMO Harris Bank, N.A. v. Custom Diesel Express, Inc.*, No. 2:16-CV-60, 2017 WL 1367205, at *3 (E.D. Tenn. Apr. 12, 2017) (granting summary judgment when debtor's only proof was that the sale price was too low).

Defendants have not controverted, that Ascentium used its best efforts to advertise the motorbuses through the appropriate industry channels.

### C. Whether Defendants' Affirmative Defenses Fail as a Matter of Law

#### 1. Whether Defendants' Performance Is Excused Because Performance Was Impossible or Impractical[11]

In their answer, Defendants assert that the economic harm caused to the motorbus industry from COVID-19 made their performance impossible and impracticable, and they should consequently be excused from performing. Doc. 6, Aff. Defs. 1, 3. Ascentium argues that Defendants' affirmative defenses of impossibility and impracticability fail as a matter of law.

Under California law, a party is excused from performing a contract when performance is objectively impossible. *Autry v. Republic Prods., Inc.*, 180 P.2d 888, 891 (Cal. 1947). The impossibility defense also applies when performance becomes impracticable "because of extreme and unreasonable difficulty, expense, injury, or loss involved." *Id.*

However, "[t]he duty of a promisor is never discharged . . . by the mere fact that supervening events deprive him of the ability to perform, if they are not such as to deprive other persons, likewise, of ability to render such a performance." *United States v. Grayson*, 879 F.2d 620, 624 (9th Cir. 1989); *also see Ashker v. Sayre*, No. C 05-03759 CW, 2010 WL 476634, at *3

---

[11] In their response brief, Defendants argue "The performance of the agreements is excused by force majeure or the impossibility of performance." Doc. 88, at 28-29. They also argue performance is excused because the coronavirus pandemic is an act of God. *Id.* at 29. Defendants fail to explain if they are now asserting three affirmative defenses or if these are all different ways of describing their impossibility defense. The Court will treat Defendants as if they are doing the latter because if Defendants are trying to raise a new affirmative defense their efforts are untimely, *see Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 714-15 (8th Cir. 2008) (citing Fed. R. Civ. Proc. 8(c)), and would be prejudicial to Ascentium at this late date. *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th Cir.2005).

(N.D. Cal. Feb. 4, 2010) ("subjective impossibility [] does not excuse non-performance of a contract."); *and* 6A Corbin, Corbin on Contracts § 1332 at 361 (2d ed. 1962).

Consequently, Courts have made clear that a party is not entitled to an impossibility or impracticability defense unless the change in circumstances made it impossible for everyone else to perform. *Grayson*, 879 F.2d at 624 ("Although the Graysons were unable to discharge their duty under the guaranty agreement, it was not because payment to the EDA of the amounts due was objectively impossible."); *Su Jung Shin v. Yoon*, No. 117CV01371AWISKO, 2020 WL 6044086, at *6 (E.D. Cal. Oct. 13, 2020) ("The fact that Judgment Debtors are currently unable to raise the funds necessary to make the two $50,000 payments still due under the Stipulated Judgment, however, obviously does not mean that COVID-19 has 'likewise deprived' 'other persons' of the ability to make $50,000 payments. Judgment Debtors have not made—and cannot make—such a showing and thus fail to establish an impossibility defense."); *Hebrank v. Linmar Mgmt., Inc.*, No. 13–cv–2179, 2014 WL 3741634, at *4 (S.D. Cal. July 29, 2014) ("Thus, 'a party may not generally rely on an impossibility defense to justify its failure to make payments' because the mere fact that one is unable to make a payment is 'not objectively impossible or impracticable.'").

The fact that Ascentium could not make payments does not excuse their nonperformance because they have failed to show, that paying debts became an objectively impossible or impractical task for everyone due to the pandemic. As a result, these affirmative defenses fail.

### 2. Whether Defendants' Performance is Excused Because the Purpose of the Agreements was Frustrated

Ascentium also argues its performance is excused because the primary purpose for Defendants entering the contracts was to provide charter bus services, which became impossible due to COVID-19. Doc. 6, Aff. Def. 2.

To excuse nonperformance of a contract on the ground of commercial frustration, "1) the basic purpose of the contract, which has been destroyed by the supervening event, must be recognized *by both parties to the contract* . . . 2) the event must be of a nature not reasonably to have been foreseen . . . and the frustration must be so severe that it is not fairly to be regarded as within the risks that were assumed under the contract . . . and 3) the value of counterperformance to the promisor seeking to be excused must be substantially or totally destroyed." *Peoplesoft U.S.A., Inc. v. Softeck, Inc.*, 227 F. Supp. 2d 1116, 1119–20 (N.D. Cal. 2002) (emphasis added); *see also Waegemann v. Montgomery Ward & Co.*, 713 F.2d 452, 454 (9th Cir. 1983) ("In applying the frustration excuse courts look to see if 'the *fundamental reason of both parties* for entering into the contract has been frustrated'") (emphasis in original) (citing *Cutter Lab'ys, Inc. v. Twining*, 34 Cal. Rptr. 317 (Cal. Ct. App. 1963)).

Here, Defendants have failed to point to any evidence that Ascentium's purpose was for Defendants to operate motorcoaches—instead of being paid for having made a loan. In fact, the only evidence introduced by either party shows Defendants did not know why Ascentium entered these agreements. Ex. 100 (Defendants' first interrogatory answer), at p. 2 (stating "Defendants have no information about the purpose of Plaintiff's in entering into the Agreements."). Since Defendants bear the burden of proof on their affirmative defense, and have presented no evidence that could support it, Ascentium is entitled to summary judgment on it.[12]

### 3. Whether Defendants Mitigated Their Damages

Defendants argue that Ascentium failed to mitigate their damages because their disposition of the collateral was unreasonable. The parties agree that this issue is largely a reformulation of

---

[12] Since the affirmative defense fails for the reasons stated in the order, the Court will not address whether the value of counterperformance has been substantially destroyed.

the commercial reasonableness inquiry. As stated above, Ascentium has established that a reasonable juror could only determine that the sale of the collateral was commercially reasonable. *See supra* Section III.B.1. Therefore, Defendants' mitigation affirmative defense fails as well.

### D. Damage Calculation

Under the terms of the loan agreements Ascentium is entitled to recover all past due amounts plus 1.5% interest on past due amounts that accrues monthly, attorney's fees, and costs. *See* Exs. 4, 31, 47, 64, 76.

Ascentium has recently updated its damages calculation, to account for the interest owed under the agreements, as of January 4, 2022, and to fix two accounting errors. *See* Docs. 95, 98. Based on the updated calculation Ascentium was owed $328,891.90 as of January 4, 2022, plus interest in the amount of $118.85 for every day between January 4, 2022, and the date of judgment. Under California law, Ascentium is also entitled to its reasonable attorney's fees and costs. *See* Cal. Civ. Code § 1717 (stating when a contract provides that a party is entitled to attorney's fees and costs, that the party "shall be entitled to reasonable attorney's fees in addition to other costs.").

## IV. CONCLUSION

For the reasons discussed above, Ascentium's motion for summary judgment is granted. Ascentium is entitled to a judgement against Defendants Ted Littell and White Knight for $328,891.90, plus interest in the amount of $118.85 for every day between January 4, 2022, and the date of this order. In addition, Ascentium is entitled to its reasonable attorney's fees and costs.

/s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: February 1, 2022
Jefferson City, Missouri